**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

GINA DURBANO,

                                        CASE NO. 17-cv-10231
        *Plaintiff*,                    DISTRICT JUDGE MARIANNE O. BATTANI
*v.*                                    MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant.*
_____/

**REPORT AND RECOMMENDATION ON CROSS MOTIONS**
**FOR SUMMARY JUDGMENT (Docs. 12, 14)**

I.    **REPORT**

**A. Introduction and Procedural History**

        This is an action for judicial review of a final decision by the Commissioner of

Social Security denying Plaintiff Gina Durbano's claim for disability benefits under the

Disability Insurance Benefits program of Title II, 42 U.S.C. § 401 *et seq*., and

Supplemental Security Income Benefits under Title XVI, 42 U.S.C. §§ 1381-1383f. (Doc.

1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of

Reference, this case was referred to the undersigned Magistrate Judge. (Doc. 2). The

matter is currently before the Court on cross-motions for summary judgment. (Docs. 14,

17).

        Durbano was born on June 9, 1978, making her 35 years old when she filed her

initial applications for Disability Insurance Benefits and Supplemental Security Income

on August 29, 2013. (Tr. 70, 175, 177). After the Commissioner denied her claim,

Durbano requested a hearing, (Tr. 131-32), which was held before Administrative Law Judge Jeanne M. VanderHeide, (Tr. 67), and included testimony from both Durbano, (Tr. 69-90), and Vocational Expert Diane Riggin, (Tr. 90-94). Ultimately, the ALJ found that Durbano had not been under a disability during the relevant time period, (Tr. 48-61), and the Appeals Council denied Durbano's request for review. (Tr. 1-5). This action followed.

**B. Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it

2

must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

**C.     Framework for Disability Determinations**

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If

> you can still do your past relevant work, we will find that you
> are not disabled. . . .
>
> (v) At the fifth and last step, we consider our assessment of
> your residual functional capacity and your age, education, and
> work experience to see if you can make an adjustment to
> other work. If you can make an adjustment to other work, we
> will find that you are not disabled. If you cannot make an
> adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528,
534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the
existence and severity of limitations caused by her impairments and the fact that she is
precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336
F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable
physical or mental impairment (expected to last at least twelve months or result in death)
that rendered her unable to engage in substantial gainful activity. 42 U.S.C. §
423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth
step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*,
459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to
show that "other jobs in significant numbers exist in the national economy that [the
claimant] could perform given her RFC [residual functional capacity] and considering
relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§
416.920(a)(4)(v), (g)).

## D.    ALJ Findings

Following the five-step sequential analysis, the ALJ concluded that Durbano was
not disabled under the Act. First, the ALJ found that Durbano had not engaged in

substantial gainful activity since July 1, 2013, her alleged onset date. (Tr. 53). Next, the

ALJ determined that Durbano had the following severe impairments: osteoarthritis and

meniscal tear of the left knee, obesity, depression, anxiety, and bipolar disorder. (*Id.*).

Durbano did not, however, have "an impairment or combination of impairments that met

or medically equalled the severity of" a listed impairment. (Tr. 54). The ALJ concluded

that Durbano had

> the residual functional capacity to perform sedentary work as defined in 20
> CFR 404.1567(a) and 416.967(a) with the following additional limitations:
> sitting or standing alternatively but not sitting or standing more than 30
> minutes at one time; no climbing of ladders, ropes, or scaffolds; occasional
> climbing of ramps and stairs, stooping, crouching, kneeling or crawling;
> limited to simple, routine tasks with low stress job[s,] defined as only
> occasional decision making, only occasional changes in the work setting
> and no fast paced production work; only occasional interaction with the
> public and coworker[s]; no tandem tasks; and only occasional supervision.

(Tr. 55). With that RFC, Durbano would be unable to perform any relevant past work.

(Tr. 60). She would, however, be able to perform 370,000 sedentary unskilled jobs in the

national economy, including the representative occupations of inspector, sorter, and

assembler. (Tr. 61). Thus, the ALJ found that Durbano that had not been under a

disability from her alleged onset date of July 1, 2013, through the date of her decision,

October 26, 2015. (*Id.*).

**E.      Administrative Record**

**1. Medical Evidence**

The Court has thoroughly reviewed Durbano's medical record. In lieu of

summarizing her medical history here, the Court will make reference and provide

citations to the record as necessary in its discussion of the parties' arguments.

## 2. Application Reports and Administrative Hearing

### a. Durbano's Function Report

Durbano completed her function report on September 8, 2013. (Tr. 230-37). She wrote that her mental impairments limited her ability to work: "I have missed many hours of work due to this. I have had many days I could not bring myself to get out of bed because I wa[s] so depressed. I also have anxiety about being around people. I become easily aggitated. (sic) I also have trouble with concentration, and sometimes when I am manic my fearless attitude will get in the way of my performance." (Tr. 230).

Her daily routine varied depending on her mental state. She explained that when depressed, she would "stay in bed; no shower[,] no meal prep." (Tr. 231). When manic, "it could be anything from shopping sprees to fixing around the house, cleaning." (*Id.*) On the other hand, on "normal days I will shower, clean, prep dinner, spend time with fam[ily]." (*Id.*). Her sleep schedule also varied: "I sometimes am only able to sleep for an hour or so at night, and sometimes I am so tired I can't keep my eyes open . . . ." (*Id.*).

She wrote that her impairments also affected her ability to bathe, care for her hair, and shave, because "[I] just don't care sometimes." (*Id.*).

Her impairments did not, however, interfere with ability to dress, feed herself, or use the toilet, and she could take care of all household chores. (Tr. 232). She cared for her children—preparing meals, bathing them, and giving them guidance. (*Id.*). Her mother helped by taking the kids "a lot" and her father lived with her and helped "keep them in line." (*Id.*). Every week she spent a day cleaning and doing laundry. (Tr. 231). Five times a week, she prepared her own meals—sometimes sandwiches and sometimes "meals"—

6

but she added that she "used to cook meals daily. Now I only actually cook a couple times a week." (Tr. 232).

She also went outside five times a week, and could drive and go out alone. (Tr. 233). Every day she spent time with her family at home and at her mother's. She also went to school three days a week unaccompanied. (Tr. 234). She shopped in stores for household needs twice a month, getting "in and out as fast as I can." (Tr. 233). She could pay bills, count change, handle a savings account, and use a checkbook or money orders, although her impairments caused "instances of spending sprees." (Tr. 233-34).

Her hobbies were watching TV, using the computer, and reading; she did these things "daily and well." (Tr. 234). She added that she had not read as much since the onset of her impairment, and "what I have tried to read lately goes unfinished." (*Id.*).

She marked that her impairments affected the following: memory, completing tasks, concentration, and getting along with others. (*Id.*). She reported she was "sad most of the time so I don't want to be around people." (*Id.*). Her anger also sometimes caused conflict with family, and she wrote, "I don't go out anymore. I don't have friends anymore." (Tr. 235). She handled stress "not well," saying, "I get anxious and either lash out or hide in my room." (Tr. 236). She was mostly respectful toward authority figures, and marked that she had never been fired or laid off from a job because of problems getting along with other people. (*Id.*). Most days she could pay attention for a half-hour or so, but "others not so much." (Tr. 235). She finished what she started. (*Id.*) She followed spoken instructions "OK," while for written instructions it "[d]epends, sometimes I only do things my way[,] others I follow just fine." (*Id.*).

7

She did not indicate that she suffered from any physical impairments. She could walk a half mile before needing to rest for a "couple" minutes. (Tr. 235).

### b. Third Party Function Report—Pamela Durbano

Durbano's mother, Pamela Durbano, also completed a third-party function report on September 8, 2013. (Tr. 219-29). At that time, she had known Durbano for 35 years and spent about 15 to 20 hours per week with Durbano, visiting and going shopping. (Tr. 219). She wrote that Durbano's impairments limited her ability to work because they made her "intolerant to people," her depression kept her "from wanting to get up and [go] to work," and she had "spells of crying for no known reason." (*Id.*). She was also "always tired" because she woke up "at all hours of the night." (Tr. 220). According to her mother, from the time Durbano woke up until the time she went to bed, she stayed in her room or played on the computer. (*Id.*). She also, however, took care of her children and cooked and cleaned for them without any help. (*Id.*).

Durbano's mother confirmed that she had no problem performing personal care and could prepare her own meals daily—"all but several course meals." (Tr. 221). She was also able to spend a full day cleaning, doing laundry, and working in the yard without any help. (*Id.*). For fun, Durbano liked to read, although her mother was "[n]ot sure quite how often" and reported that "she lacks concentration."

Durbano went outside "not often." (Tr. 222). She could drive and could go out alone. (*Id.*). She also went to the doctor on a regular basis. (Tr. 223). Once or twice a month, she shopped for groceries and clothing for her children for "no longer than two

8

hours." (Tr. 222). She remained able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (Tr. 223).

When asked which activities were affected by Durbano's impairments, her mother marked the following: walking, stair climbing, memory, and getting along with others. (Tr. 224). She explained: "Her arthritis is in her knees," and estimated that Durbano could walk the length of a football field before needing to rest 10 to 15 minutes. (*Id.*). Further, Durbano's attention span was "not long," although she was able to finish what she had started. (*Id.*). She followed written or spoken instructions "not well." (*Id.*). Her mother described her as "very reclusive," as she was easily agitated by other people, (Tr. 223-24), although she was "very" respectful of authority figures. (Tr. 225).

### c. Durbano's Testimony at the Administrative Hearing

Durbano began her testimony with a survey of her relevant past employment. Most recently, she had worked part-time as a cashier at Target on a seasonal basis; she had also worked as a cashier when she was younger. (Tr. 71). Target let her go "because the season had ended"; she "was the only one that they let go." (Tr. 86-87). She noted that she "had to leave my register often because my knee was in pain, and they don't like you leaving the register there." (Tr. 87) She had also been late "a couple times" and missed one day of work during the month she worked there part-time. (*Id.*).

Prior to working at Target, she had worked full-time as a phlebotomist and as a medical assistant. (Tr. 71). She "was constantly depressed" and "missing work probably once a week," (Tr. 74), because "[t]here were days that I just couldn't get out of bed." (Tr. 87). Her health, especially her mental health, "started getting worse and worse," until

in 2011 she was hospitalized during a shift for suicidal ideation. (Tr. 74, 88). She was later fired when she "messed up two patient samples" in a week during a manic episode. (Tr. 74). "I could have killed somebody," she explained. (*Id.*).

She had also been employed as a fast food worker for about ten months in 2005, but the ALJ decided not to consider that position. (Tr. 73).

As for mental impairments, Durbano reported that she had been diagnosed with "bipolar and anxiety." (Tr. 74). She had attempted suicide when she was 12 years old, and had "received counseling on and off since then." (Tr. 90). Her earning record showed that she was able to work from 2001 to 2012, but she had "battled the depression and the mania for so long that it finally all came to a head then, and that was the point where I just said I can't do this anymore." (Tr. 90).

She explained that she could not work on a consistent basis "[b]ecause my moods swing like crazy sometimes. I am depressed a lot so there are days that I couldn't go to work." (Tr. 89). She found herself unable to get out of bed "at least once" in a typical month. (*Id.*). "I want to die 90 percent of the time," she said. "I don't care to go and do anything with anybody. I stay in my room in bed during those times, cry a lot . . . of the day." (Tr. 84). She did not tell her therapist that she sometimes felt suicidal "because then I would go to the hospital." (Tr. 83-84).

 Further, she said, "Dealing with people is very difficult for me so . . . I would maybe end up telling somebody off, or something like that . . . ." (Tr. 89). She described an incident during her employment at Target in which she "mouthed off" to a supervisor, although "[t]hey didn't write me up for it." (*Id.*).

10

At the time of the hearing, she was taking Xanax, as well as Synthroid and Lisinopril. (Tr. 76). She had stopped taking antidepressants and mood stabilizers three or four months prior to the hearing because "the side effects were too much." (*Id.*). "It was giving me really bad headaches every day, and I couldn't concentrate for anything on that medication. And I had this weird twitching thing that started with my hand so I said, I can't do it." (Tr. 83). She denied having any manic episodes since stopping her mood stabilizer, although she "was a little hypo-manic . . . kind of elevated . . . . Just a little happier, and I spend money that I don't have but not horrible." (Tr. 86). Every two to three weeks she attended appointments at Renewal Christian Counseling; she had been getting treatment there "regularly" for "approximately a couple of years." (Tr. 88).

Besides her mental health impairments, Durbano also complained of pain in her left knee, made worse by walking and standing. (Tr. 75). She could not sit in the same position "for very long" before needing to move her leg to keep it from getting stiff. (Tr. 83). She estimated she could stand for 20 minutes and walk two blocks, adding, "I can't even get through Wal-Mart all the way without being in pain." (*Id.*).

In January 2014, Durbano underwent surgery on her knee. (Tr. 76, 335). She was prescribed physical therapy after her surgery, but only attended one session. (Tr. 78) Dr. Zeiger had tried giving her injections to treat her knee pain, "but they stopped working." (Tr. 76). She testified that she dealt with the pain by taking Mobic and Vicodin—she took Vicodin about once a day, "probably five out of seven days a week"—and iced her knee and kept it elevated "when it's really inflamed." (Tr. 75). She reported that Dr. Zeiger had indicated "the next step would be a replacement, a knee replacement." (Tr. 76).

11

Durbano also described her daily life. At the time of her testimony, Durbano lived in a one-story house with her father and her three children, ages 6, 14, and 19. (Tr. 70). Her father had moved in with her five years ago, when he was released from prison, and "he stayed to help." (Tr. 73-74). At the time of the hearing, he was in his seventies. (Tr. 74).

Durbano was able to shower, get dressed, and do her hair. (Tr. 79). She sometimes had trouble sleeping because her knee pain would wake her up. (Tr. 78). She generally slept about 6 hours a day, although when she was manic, she would not sleep at all for a night or two. (Tr. 78-79). As for household chores, she made meals "[h]alf the time. If I'm not in a mood, I'll make my meals. I can sit down in between so the pain in my knee's not too bad to make a meal. . . . But if I'm depressed or sad, there's no cooking, there's no leaving my room half the time." (Tr. 79-80). Her children usually did the dishes, but "sometimes" she did them. (Tr. 80). Her children also helped her clean the house about once a week, but "[n]ot all at once." (*Id.*). Cleaning the bathrooms presented no trouble for her. (*Id.*). She also had "no problem" doing the laundry for herself and her youngest child. (Tr. 81). Her son and her father took care of mowing the lawn. (*Id.*).

Durbano also was able drive with no restrictions on distance. (Tr. 79). She was in charge of the grocery shopping for the household. (Tr. 80). She "generally" went with her mother or daughter because, she said, "I have a hard time in grocery stores. There's too many people there." (*Id.*). For that reason, she went shopping either "earlier in the morning, or later in the evening." (Tr. 80-81). She could bring in the groceries, which she estimated weighed five to ten pounds. (Tr. 81).

In her free time, she "read here and there" and "watch[ed] a lot of TV." (*Id.*). She also spent time with her children, playing with her six-year-old daughter "a lot" and reading her books. (Tr. 82). While her daughter was home from school for the summer, she took her to the park and beach across the street "and let her run around and play." (Tr. 82). During the school year, Durbano helped her with homework. (Tr. 85). She found it more challenging to help her son because "he just started high school so there's a lot of math in there that I don't know anymore," and "[h]e's learning disabled with reading, and he's got ADHD." (Tr. 85).

### d. The Vocational Expert's Testimony at the Administrative Hearing

On the day of the hearing, Vocational Expert ("VE") Diane Riggins completed a worksheet titled Claimant's Work Summary as Indicated in the Record. (Tr. 265). The VE classified Durbano's previous work as cashier (unskilled light work), phlebotomist (semi-skilled light work, performed at medium), medical assistant (skilled light work), and fast food worker (unskilled light work). (*Id.*). At the hearing, however, the ALJ decided not to consider Ms. Durbano's position as a fast food worker. (Tr. 92).

The ALJ began questioning the VE with the following hypothetical:

Assuming a person of the claimant's age, education and work experience and skill set, if the individual was limited to sedentary work as defined by the regulations. The individual would require a sit stand option, sitting or standing alternatively but not sitting or standing more than 30 minutes at a time. The individual would be limited to no climbing ladders, ropes or scaffolds, occasionally climbing of ramps or stairs. Occasional stooping, crouching, kneeling and crawling. The individual would require work that is limited to simple, routine tasks with a low stress job defined as having only occasional decision making, only occasional changes in the work setting, and no fast paced production work. The individual should have

only occasional interaction with the public, occasional interaction with co-workers with no tandem tasks, and only occasional supervision.

(Tr. 90, 92). Given those limitations, the VE said, the claimant would be unable to do any of Durbano's past work. (Tr. 92). She would, however, be able to work as an inspector (2,000 jobs in southeast Michigan, 100,000 in the national economy), a sorter (2,000 jobs in southeast Michigan, 120,000 in the national economy), or an assembler (3,000 jobs in southeast Michigan, 150,000 in the national economy). (Tr. 92-93). The VE acknowledged that the sit/stand option was not covered by the DOT, but was based on her experience in the field. (Tr. 93).

Next, the ALJ asked about a claimant with those hypothetical limitations who had to miss work two to four days a month on a consistent basis "due to mental impairments and associated symptoms." (*Id.*). The VE responded that such a limitation would eliminate competitive employment. (*Id.*).

Then Durbano asked about a person who needed "unscheduled breaks every—let's say every hour from five to 15 minutes at a time where they would need to sit quietly, whether it's to elevate her leg, or just to kind of gather herself emotionally." (*Id.*). The VE testified that that requirement would eliminate competitive employment. (*Id.*).

Finally, the ALJ asked whether a claimant who needed to take five-minute breaks every two hours would still be eligible for competitive employment, and the VE said she would. (*Id.*).

**F.      Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship,

15

supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists; the ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of*

17

*Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

A claimant's description of her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment." 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). "[O]bjective evidence of the pain itself" is not required. *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication .
       . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

**G.    Analysis**

**1. Physical RFC**

**a. The ALJ Provided Good Reasons for Her Decision to Assign Little Weight to Dr. Zeiger's Opinion.**

Durbano challenges the ALJ's decision to assign limited weight to the opinion of treating physician Dr. Zeiger.[1] (Doc. 12 at 597-99). It is true the ALJ must provide "good reasons" for the weight she assigns the treating source's opinion in her written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). A decision denying benefits

> [m]ust contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight

---

[1] Durbano cites almost exclusively Ninth Circuit case law in her brief; she does not once cite Sixth Circuit case law. While I recognize that other circuits' law may be persuasive to this Court, it is not controlling.

the adjudicator gave to the treating sources opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242.

Dr. Zeiger, in his Arthritis Residual Functional Capacity Questionnaire, opined that Durbano's impairments would "frequently" be severe enough to interfere with the attention and concentration needed to perform even simple tasks—although he also thought her "[c]apable of low stress jobs." (Tr. 351). He indicated that Durbano could stand for one hour at a time, and could sit for more than two hours at a time. (*Id.*). She could walk four city blocks without pain. (*Id.*). She would need to take a five-minute walk about once an hour during an eight-hour workday. (Tr. 352). She would need a job that permitted shifting positions at will between sitting, standing, and walking. (*Id.*). He estimated that she would need to take five- to fifteen-minute breaks every one to two hours. (*Id.*). She could rarely twist, stoop, or climb stairs, and could never crouch or climb ladders. (Tr. 353). She could frequently carry less than 10 pounds, occasionally carry 10 pounds, rarely carry 20 pounds, and never carry 50 pounds. (Tr. 352). Additionally, Dr. Zeiger estimated that she would be absent about four days a month. (Tr. 353).

The ALJ assigned Dr. Zeiger's opinion "little weight" because "his conclusions are not supported by the evidence of record including the Function Reports completed by the claimant and her mother." (Tr. 59). As the ALJ describes earlier in her opinion, "[t]he claimant admits she performs personal care, prepares meals, performs household chores," "cares for her children, goes grocery shopping, watches television, reads books, helps her

child with homework, plays on the computer, and manage[s] her finances. The performance of such activities on a regular and continuing basis indicates that the claimant's level of pain and depression does not seriously interfere with her ability to maintain attention and concentration, perform routine tasks, understand and follow simple instructions, and interact with others." (Tr. 57). Durbano's mother marked in her function report that Durbano had no limitations related to sitting or standing. (Tr. 57). And more importantly, in her own function report, Durbano "failed to indicate that her ability to sit, stand or walk is affected by her impairments." (Tr. 57) (internal citation omitted).

Moreover, the ALJ pointed out, although Dr. Zeiger said Durbano's symptoms frequently interfere with her attention and concentration, the claimant denied memory or concentration problems in June 2013. (Tr. 59; 292). And "when examined on March 10, 2015, the claimant exhibited normal attention and concentration, and intact memory." (Tr. 59). At the administrative hearing held on September 14, 2015, the ALJ observed that Durbano was able to "closely and fully attend the hearing proceedings. She sat throughout the entire hearing, appeared to have no difficulty sitting or rising, and did not appear to be in pain or any other distress." (Tr. 58). Nor did she use an ambulation aid. (*Id.*).

Durbano asserts that her and her mother's function reports were out of date—they completed the reports in September 2013, after which, she says, her "physical conditions, with respect to her knee and osteoarthritis, continued to deteriorate." (Doc. 12 at 598). In January 2014, Durbano underwent surgery on her knee. (Tr. 335). "It is unclear," she

argues, "how a Function Report filled out before the need for surgery or treatment is a basis for not giving a physician's opinions controlling weight." (Doc. 12 at 598). In essence, then, Durbano disputes how much weight the ALJ gave her and her mother's function reports in her analysis.

As an initial matter, I note that the ALJ did not base her weight determination for Dr. Zeiger solely on the conflict between Dr. Zeiger's opinion and the function reports. That aside, it was the ALJ's responsibility to weigh the function reports alongside the evidence of Durbano's limitations after surgery and the rest of the record, which the ALJ did—she found the claimant "not entirely credible," (Tr. 56), a determination that Durbano has not challenged. (*See* Doc. 12); *see Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 41 (6th Cir. 2006) ("[W]e limit our consideration to the particular points that Hollon appears to raise in her brief on appeal."). This Court may not now snatch the scales away for its own use. *Albanna v. Comm'r of Soc. Sec.*, No 15-14264, 2016 WL 7238925, at *1, *12 (E.D. Mich. Nov. 22, 2016) ("Arguments which in actuality require 'reweigh[ing] record evidence' beseech district courts to perform a forbidden ritual.") (quoting *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014)).

Two final arguments remain regarding Dr. Zeiger's RFC. First, Durbano also asserts that "Dr. Zeiger's RFC statements as well as his office notes contain sufficient objective evidence to support his findings . . . ." (Doc. 12 at 598). But if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human*

*Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). And as a final matter, Durbano argues at some length that "it is not proper to reject a doctor's medical opinion because it was based on the patient's complaints." (Doc. 12 at 599). Nothing in the ALJ's opinion indicates that reasoning played any role here.

In conclusion, I suggest that good reasons supported the ALJ's decision to give Dr. Zeiger's opinion "little weight."

### b. Substantial Evidence Supported the ALJ's Finding That Durbano Was Capable of Sedentary Work with Additional Limitations.

Durbano argues that "substantial evidence of record from the treating physicians' [sic] do not support a finding that Ms. Durbano can perform the exertional demands of sedentary work." (Doc. 12 at 595). As an initial matter, I note that it is the ALJ's duty to consider *all* evidence in the record when making her decision, 42 U.S.C. § 423(d)(5)(B), and that a treating physician's opinion does not automatically control. SSR 96-5p, 1996 WL 374183 (July 2, 1996). Construing this as an argument that the ALJ simply lacked substantial evidence for her sedentary RFC, however, I turn to the definition of "substantial evidence": "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

Here, the ALJ found that Durbano was capable of performing sedentary work with some additional limitations. (Tr. 55). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and

small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a); (Tr. 55). The ALJ imposed additional physical limitations: "sitting or standing alternatively but not sitting or standing more than 30 minutes at one time; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, stooping, crouching, kneeling, or crawling . . . ." (Tr. 55).

The ALJ's decision indicates that she examined Durbano's treatment notes and the record of her knee surgery, as well as her reports post-surgery of "pain with full extension of the knee and disrupted sleep[,] . . . decreased range of motion, tenderness, crepitus, swelling, and abnormal gait." (Tr. 56). But the ALJ remarked that Durbano "has not sought the type of treatment one would expect for an individual claiming to suffer from disabling chronic knee pain," such as chiropractic care, pain management, or additional surgical intervention. (*Id.*). Further, Durbano "has been noncompliant with her treatment recommendations for her left knee impairment." (*Id.*). Although after her knee surgery she was prescribed physical therapy thrice weekly for two weeks—and told her treating physician that she had completed this therapy—at her hearing she "testified that she attended one session of therapy and never returned." (*Id.*).

Further, the ALJ noted that Durbano's "presentation and demeanor at the hearing was also inconsistent with her allegations of disabling symptoms." (Tr. 58). The ALJ observed that Durbano "was able to closely and fully attend the hearing proceedings. She sat throughout the entire hearing, appeared to have no difficulty sitting or rising, and did

24

not appear to be in pain or any other distress." (*Id.*). Nor did she use an ambulation aid. (*Id.*). The ALJ also remarked on Durbano's "inconsistent statement in the record" as hurting her credibility. (Tr. 57). As discussed above, the ALJ's opinion also touched on the inconsistencies between Durbano's function report and her testimony at the hearing, as well as inconsistencies between her reported daily activities and "her complaints of disabling symptoms and limitations." (*Id.*).

In addition, much of the ALJ's RFC assessment was in line with the assessments of Durbano's treating physicians, Dr. Kut and Dr. Zeiger, or even more restrictive. The ALJ gave "some weight" to Dr. Kut's RFC—which he updated in April 2014, (Tr. 420), some months after Durbano's knee surgery—but ultimately found his opinion to be "an over estimation of the claimant's ability," as her "knee impairment would certainly limit the claimant's ability to stand and/or walk during the workday to a greater degree than indicated by Dr. Kut." (Tr. 59). Dr. Kut said Durbano could walk one to two blocks, sit or stand for 30 minutes at a time, sit for at least 6 hours total in an 8-hour working day, and stand or walk for at least 6 hours total in an 8-hour working day. (Tr. 418). The ALJ, similarly, said that Durbano needed to sit or stand alternately, but not sit or stand more than 30 minutes at a time. (Tr. 55). Dr. Zeiger, meanwhile, had opined that Durbano was less restricted in that she could sit for more than two hours a time and stand for one hour at a time. (Tr. 351). Dr. Kut indicated that Durbano had no restrictions on lifting except that she could only occasionally lift 50 pounds. (Tr. 419). Dr. Zeiger said Durbano could frequently lift less than 10 pounds, occasionally lift 10 pounds, rarely lift 20 pounds, and

never lift 50 pounds. (Tr. 352). The ALJ found Durbano could never lift more than 20 pounds. (Tr. 55; 20 CFR §§ 404.1567(a), 416.967(a)).

Dr. Kut suggested Durbano could occasionally twist and stoop, never crouch or climb ladders, and rarely climb stairs. (Tr. 420). Dr. Zeiger said Durbano could rarely twist and stoop, never crouch or climb ladders, and rarely climb stairs. (Tr. 353). The ALJ ultimately found that Durbano could occasionally stoop, crouch, or climb ramps or stairs, and could never climb ladders. (Tr. 55). In other words, the ALJ and Dr. Kut agreed that Durbano could occasionally stoop and could never climb ladders. The ALJ's finding was less restrictive than either doctor's only in that she found Durbano could occasionally crouch and climb stairs.

Considering the evidence above, I would find that substantial evidence supported the ALJ's assessment that Durbano retained the RFC for sedentary work with additional physical limitations.

I turn now to another of Durbano's attempts to argue away the ALJ's substantial evidence for her decision. Durbano asserts that the ALJ's decision was "fundamentally flawed" because the Agency's Disability Examiner did not re-evaluate Durbano's case when new evidence arose—namely, Dr. Zeiger's RFC and Durbano's deteriorating condition and surgery. (Doc. 12 at 596).

The Sixth Circuit rejected an argument similar to Durbano's in *Ealy*, where the claimant contended it was improper for the ALJ to rely on the RFC assessments of state consultants because they were unaware that after their assessments his condition had continued to worsen, necessitating heart catheterization and stenting. *Ealy v. Comm'r of*

26

*Soc. Sec.*, 594 F.3d 504, 513 (6th Cir. 2010). The Court there noted that "[e]ven if [the state agency consultant's] RFC was completed without knowledge of these issues, however, the record reflects that the ALJ considered them." *Id.* The ALJ "specifically noted" the claimant's medical procedures that occurred after the state agency consultant's RFC assessment and "[s]pecifically to address these issues, the ALJ added to the work limitation recommended" by the consultant. *Id.* Further, the Court found "no indication that these additional restrictions reflected insufficient consideration" of the claimant's impairments. *Id.* Thus, the claimant's argument failed. (*Id.* at 513-14).

Here, the ALJ specifically noted that "[o]n January 17, 2014, the claimant underwent arthroscopy to treat her left knee" and that afterward, she "continued to experience pain with full extension of the knee and disrupted sleep," as well as "decreased range of motion, tenderness, crepitus, swelling, and abnormal gait." (Tr. 56). The ALJ did not mention the Disability Examiner's RFC determination in her opinion, but her RFC was ultimately more limited than the Disability Examiner's. (*cf.* Tr. 55, 117-118). Where the Disability Examiner had found Durbano could occasionally lift 20 pounds, (Tr. 117) the ALJ found she could never, (Tr. 55); while the Disability Examiner found that Durbano had no limitations on stooping, (Tr. 117), the ALJ found she could only occasionally stoop, (Tr. 55). And while the Disability Examiner determined Durbano could stand or walk for 4 hours and sit for 6 in an 8-hour workday, (Tr. 117), the ALJ determined she would need to alternate sitting and standing for not more than 30 minutes at a time, (Tr. 55). Like in *Ealy*, the ALJ took note of Durbano's change in condition and accounted for it, and so Durbano's argument should fail.

27

Lastly, Durbano criticizes the ALJ's RFC because it is not identical to the opinion of any medical source in the record: "Since Dr. Zeiger's RFC is *not* a Sedentary RFC, nor is the SDM RFC a Sedentary RFC . . . the only basis for a sedentary RFC is the opinion of the ALJ." (Doc. 12 at 600). Unfortunately for Durbano, the Sixth Circuit has rejected the argument that an ALJ errs simply because there is no medical opinion that corresponds directly to her RFC finding. *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727-28 (6th Cir. 2013); *see also Wagner v. Comm'r of Soc. Sec.*, Case No. 15-11553, 2016 WL 1729553 at *1 (E.D. Mich. March 22, 2016). And here, as explained above, the ALJ thoroughly examined the evidence of record, and substantial evidence supports her conclusion.

### 2. Mental RFC

#### a. The ALJ Did Not Err by Giving Little Weight to Cubitt's Opinion.

Durbano does not dispute that Cristy Cubitt, a therapist at Renewal Christian Counseling Center, is not an acceptable medical source. (Tr. 59, *see* Doc. 12). Instead, she argues that it was error for the ALJ to give "little weight," (Doc. 59), to Cubitt's opinion based on her "minimal treating relationship" with Durbano. (Doc. 12 at 601). She asserts that "this is wrong as the record demonstrates that at the time of the hearing Ms. Durbano had been treating with Ms. Cubbitt (sic) for over 1 year." (*Id.*).

When determining how much weight to assign to a medical source opinion, one appropriate factor for an ALJ to consider is "the length of the treatment relationship and the frequency of examination." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th

Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). This is true for "other source" opinions like Cubitt as well as acceptable medical sources. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Here, the ALJ explained that despite Durbano's claim that she had been receiving treatment at Renewal Christian Counseling Center for several years and had recently begun seeing Cubitt every two weeks, "the evidence of record indicates the claimant has attended approximately two counseling sessions and two visits with her psychiatrist since the alleged disability onset date[, July 1, 2008]." (Tr. 51, 57). It is true that the record contains evidence of only two meetings between Cubitt and Durbano: one in June 2013, (Tr. 292), and the other in November of the same year. (Tr. 333). It was not improper for the ALJ to consider this record evidence in determining how much weight to assign to Cubitt's opinion.

### b. The ALJ Did Not Err by Omitting Certain Limitations from Her RFC and Hypotheticals.

Durbano complains that "the ALJ seems to cherry pick only the least restrictive limitations or describe them in such a way to suggest Ms. Durbano is more functional." (Doc. 12 at 601-02). Specifically, she takes issue with the fact that the ALJ "left out key findings," such as the opinion of reviewing psychologist Dr. Strait that Durbano is "'moderately impaired' in her ability to complete a normal workday and work week without interruption from psychological based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," (*Id.* at 601; Tr. 106), and Cubitt's finding that Durbano's ability to perform at a consistent pace without an

29

unreasonable number and length of rest periods was "fair." (Doc. 12 at 601; Tr. 358, 528).

As an initial matter, I note that there is no need for Durbano to argue that "[w]hat is abundantly clear is that Ms. Durbano's ability to concentrate, her persistence and pace is at a minimum moderately impaired"—the ALJ indeed found Durbano to have "moderate difficulties in maintaining concentration, persistence, or pace," (Tr. 54-55). And it appears that the ALJ adequately addressed those limitations by restricting Durbano to "simple, routine tasks with low stress job[s,] defined as only occasional decision making, only occasional changes in the work setting and no fast paced production work; only occasional interaction with the public and coworker; no tandem tasks; and only occasional supervision." (Tr. 55); *see, e.g.*, *Robinson v. Comm'r of Soc. Sec.*, Case No. 2:15-cv-11377, 2016 WL 2893927, at *9 (E.D. Mich. April 28, 2016); *Thomas v. Colvin*, Case No. 1:16CV00675, 2016 WL 8346524, at *13 (N.D. Ohio Feb. 27, 2017) (finding "[t]he ALJ adequately accounted for Plaintiff's moderate limitations with concentration, persistence, or pace by limiting her to simple, routine, repetitive tasks [and] no fast pace or high production quotas"); *Pruitt v. Comm'r of Soc. Sec.*, No. 14-11230, 2015 WL 5730023, at *7 (E.D. Mich. Aug. 24, 2015) (upholding a limitation of no production-pace work to account for moderate difficulties in concentration, persistence, or pace).

Still, I will address Durbano's concerns about the ALJ's analysis. To begin, an allegation that the ALJ was "cherry picking" the record "is seldom successful because it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723 (6th Cir. 2014); *see also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th

Cir. 2009) ("But we see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence."). Further, "[i]t is well settled that '[a]n ALJ can consider all the evidence without directly addressing in his [or her] written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. A'ppx 496, 508 (6th Cir. 2006).

Here, the ALJ pointed to substantial evidence of record in support of her finding: "the opinion of treating physician, Dr. Zieger, who indicated the claimant is capable of low stress jobs," "the opinions of Division of Disability Determination (DDD) reviewing psychologist, Dr. Strait, [who] determined the claimant can perform routine 2 step tasks on a sustained basis," and Durbano's and her mother's descriptions of her daily activities. (Tr. 55). For example, the ALJ noted that Durbano "performs personal care, prepares meals, performs household chores," and "cares for her children, goes grocery shopping, watches television, reads books, helps her child with homework, plays on the computer, and manage[s] her finances." (Tr. 55) (internal citations omitted).

Additionally, as discussed above, the ALJ properly determined Cubitt's opinion was entitled to "little weight." (Tr. 59). In this, the ALJ did not act improperly—she merely executed her duty to weigh the evidence. It is not this Court's place to perform a weighing of its own, and it is irrelevant whether Durbano can point to substantial evidence that would support a decision different from the ALJ's, so long as the ALJ's decision is also supported by substantial evidence. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

Durbano also makes a somewhat confused argument that "as noted previously the ALJ had a flawed RFC and as such had a flawed hypothetical question that did not fully reflect Ms. Durbano's limitations as supported by substantial evidence." (Doc. 12 at 604). I would suggest that this argument may be briskly dispatched with, as the premise—that the ALJ's RFC was flawed—is incorrect for the reasons discussed above.

### 3. Durbano Has Waived Any Argument Alleging "Inconsistencies with the Dictionary of Occupational Titles."

Finally, Durbano's brief includes a heading arguing that "[t]his Court should remand this case with instructions to . . . resolve any inconsistencies with the Dictionary of Occupational Titles, as required." (Doc. 12 at 603-04). But Durbano never elaborates on what these alleged inconsistencies might be. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). Thus, Durbano has waived this argument.

## II.     RECOMMENDATION

For the reasons stated above, the Court **RECOMMENDS** that Durbano's Motion for Summary Judgment, (Doc. 12), be **DENIED**, the Commissioner's Motion for Summary Judgment, (Doc. 14), be **GRANTED**, and this case be **AFFIRMED**.

## III.     REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve

and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  November 2, 2017                           S/ PATRICIA T. MORRIS
                                                  Patricia T. Morris
                                                  United States Magistrate Judge

## <u>CERTIFICATION</u>

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: November 2, 2017                         By s/Kristen Castaneda
                                               Case Manager